# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

In re:

VIRGINIA ANN HOSKINGS,   Case No. 07-13785-RGM
(Chapter 13)

Debtor.

## MEMORANDUM OPINION

THIS CASE is before the court on objections to confirmation of the debtor's chapter 13 plan. The objections filed by the chapter 13 trustee and the State Department Federal Credit Union stem from changes to the Bankruptcy Code made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Both the credit union and the trustee object to confirmation because although the debtor's Schedule J shows positive monthly net income in excess of $2,000, the proposed plan calls for payments of only $375 for 58 of the 60 months of the plan, resulting in no distribution to unsecured creditors. In addition, they object to the plan as not filed in good faith. Finally, the credit union objects to the bifurcation of its claim into secured and unsecured components as a violation of the "hanging paragraph" of 11 U.S.C. §1325(a).

## Findings of Fact

The facts are not in dispute. The debtor, who is married but separated, commenced this case by filing her chapter 13 petition on December 4, 2007. Her spouse is not a co-debtor in this case.[1] The debtor's household size is three: herself, her minor daughter, and her elderly mother. Her assets consist primarily of a residence, two automobiles, and a boat, all of which are subject to liens in

---

[1] The debtor's spouse filed an individual chapter 7 petition(Case No. 07-13268-SSM) in this court on October 31, 2007, and was granted a discharge on February 4, 2008. His case was closed on May 2, 2008.

1

excess of their fair market value. The debtor scheduled unsecured nonpriority debts of approximately $106,468.

The debtor's Form 22C, the "Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income," show her and her spouse's gross monthly income to be $8,573.06 and $7,308.33, respectively. In Part III of the form, the debtor backed out her spouse's income because she asserts it is not paid on a regular basis for the household expenses of the debtor or her dependents. The result of the subtraction is that the debtor's current monthly income for purposes of 11 U.S.C. §1325(b)(3) is $8,573.06. From this figure, the debtor subtracted $9,731.78 as deductions allowed under §707(b)(2), leaving her with negative monthly disposable income of $1,158.72. The debtor's Schedules I and J tell a different story: Schedule I reports average monthly gross income of $8,573.07 and average monthly take home pay of $6,016.06. Schedule J shows average monthly expenses of $4,005. Subtracting the monthly expenses from the monthly take home pay, the debtor has average monthly net income of more than $2,000.[2]

The debtor proposes a sixty-month plan requiring two monthly payments of $778 followed by fifty-eight monthly payments of $325. Despite the fact that Schedule J shows more than $2,000 in monthly net income, the plan capitalizes on the fact that Form 22C shows negative monthly disposable income, and therefore proposes to pay nothing to unsecured creditors. The bulk of the monthly payments will go toward paying the amount owed on the single automobile that the debtor is retaining, the remainder of the debtor's attorney's fees, and fees to the chapter 13 trustee.

---

[2] Shortly before the February 13, 2008, hearing, the debtor filed an amended Schedule J to eliminate a $325 monthly deduction for an automobile installment payment objected to by the trustee. The result of this change is that the debtor's monthly net income according to Schedule J increases from $2,011.06 to $2,336.06. This change is immaterial for purposes of this opinion.

The plan also deals specifically with one of the credit union's five filed claims. The credit union filed claim number 9 in this case asserting a claim of $17,064.25 for a car loan secured by the debtor's 2005 Volkswagen Jetta ("Claim No. 9"). The credit union made the car loan to the debtor on or about September 6, 2005, which is within the 910-day period preceding the filing of the voluntary petition. There is no dispute that the car loan was intended to finance the debtor's purchase of this vehicle, that the car is encumbered by a purchase-money security interest in the credit union's favor, and that the debtor uses the Jetta for personal purposes. The debtor scheduled the credit union's claim at $17,451, secured in part by the Jetta, whose value is shown to be $13,325, and undersecured as to the rest.

The plan classifies Claim No. 9 in several different mutually exclusive places. First, the debtor lists Claim No. 9 in Section 3(A) of the plan, which deals exclusively with secured claims and is intended for "Claims to Which §506 Valuation is NOT Applicable." Claim No. 9 also appears in Section 4(B) of the plan, which is for unsecured claims separately classified and treated separately in the plan. Finally, Claim No. 9 is referred to in the special notice to the credit union at the end of the plan, which states that the debtor intends to value the Jetta and bifurcate the credit union's claim, despite the fact that earlier in the plan, the debtor states valuation is not applicable to Claim No. 9. Although not entirely clear, it appears that the plan bifurcates the credit union's claim and proposes to pay the $13,325 secured portion of the claim over sixty months with interest at 5.9% and to pay the undersecured portion of the claim in full without interest over sixty months, despite no dividend to unsecured claims.

## Discussion

### A. *The Debtor's Projected Disposable Income*

3

The trustee and the credit union both object to plan confirmation because the debtor fails to commit a sufficient amount of her projected disposable income to pay unsecured creditors. They point to Schedule J, which shows the debtor's average monthly net income to exceed $2,000. Their objection comes in two parts: (1) the debtor incorrectly subtracted her separated spouse's income from her current monthly income without a showing that the spouse does not contribute to the household; and (2) the debtor may not deduct payments on account of secured debts for property that she is surrendering. Taking these into account, they assert that Schedule J presents a more accurate calculation of the debtor's projected disposable income. The debtor agrees that she must submit all her projected disposable income to the plan during the commitment period, but asserts that she has no projected disposable income according to Form 22C. The dispute in this case hinges on how to calculate the debtor's projected disposable income and which form properly arrives at that figure.

In chapter 13, the trustee or the holder of an allowed unsecured claim may object to confirmation of plan on the basis of its treatment of unsecured claims. The court will sustain such an objection unless

> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. §1325(b)(1). The trustee and the credit union have each objected to the treatment of unsecured claims under the debtor's proposed chapter 13 plan.[3] As the plan proposes to pay nothing to unsecured creditors, it cannot satisfy §1325(b)(1)(A). Therefore, to overcome the objections, the

---

[3] The statute explicitly grants standing to the trustee to pursue an objection under §1325(b)(1). Section 1325(b)(1) also permits the "holder of an allowed unsecured claim" to object. The credit union filed several proofs of claim asserting unsecured claims. As these unsecured claims are deemed allowed unless a party interest objects, *see* 11 U.S.C. §502(a), the credit union has standing to file a §1325(b)(1) objection as the holder of an allowed unsecured claim.

plan must commit all of the debtor's projected disposable income over the life of the plan to paying unsecured creditors.

The term "projected disposable income," is not defined in the Code. However, the Code provides that "[f]or purposes of this subsection [1325(b)], the term 'disposable income' means current monthly income received by the debtor . . . less amounts reasonably necessary to be expended" for the support of the debtor and her family. 11 U.S.C. §1325(b)(2). This requires the court to determine three things. First, what is the debtor's current monthly income? Next, what amounts reasonably necessary to be expended for the support of the debtor should subtracted from current monthly income to arrive at disposable income? Finally, how does the addition of the modifier "projected" affect the calculation of disposable income?

To address the first question, "current monthly income" is a newly-defined term in the Bankruptcy Code added by BAPCPA and codified at 11 U.S.C. §101(10A).[4] Current monthly income is defined as the debtor's average monthly income from all sources, regardless of whether such income constitutes taxable income, derived during the six-month period ending on the last day

---

[4] 11 U.S.C. §101(10A) provides:

The term "current monthly income"—
(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on—
    (I) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
    (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and
(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

of the calendar month preceding the commencement of the case. The statutory definition in §101(10A)(A) does not require the inclusion of a non-debtor spouse's income if the case is not jointly filed. It is undisputed that for the debtor, the proper figure under §101(10A)(A) is $8,573.06. To this, the Code adds "any amount paid by any entity other than the debtor . . . . on a regular basis for the household expenses of the debtor or the debtor's dependents." 11 U.S.C. §101(10A)(B). In this case, the debtor includes none of her non-debtor spouse's income in determining current monthly income.[5] The credit union objects and asserts that the debtor must include that portion of her spouse's income contributed in payment of the debtor's household expenses.

In a §1325(b)(1)(B) objection, the objecting party "has, at a minimum, the initial burden of producing satisfactory evidence to support the contention that the debtor is not applying all disposable income to plan payments." 8 *Collier on Bankruptcy* ¶1325.08[2] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2007) (citing *Educ. Assistance Corp. v. Zellner*, 827 F.2d 1222 (8th Cir. 1987)); *see also In re May*, 381 B.R. 498, 507 (Bankr.W.D.Pa. 2008) (objecting creditor must show by a preponderance of the evidence that "Form 22C does not realistically reflect a best guesstimate of the debtors' anticipated future disposable income"). In this case, the credit union presented no evidence that the debtor failed to include her spouse's income as required by §§101(10A)(B) and 1325(b)(1)(B).[6] And in fact, its objection suggests that it is unsure whether

---

[5] The Bankruptcy Code's definition of current monthly income is additive, meaning the calculation begins at zero and the appropriate statutorily-required amounts, including non-debtor spousal contributions, are added. *See* 11 U.S.C. §101(10A). In contrast, the parties' briefs discuss whether the debtor appropriately *deducts* her spouse's income. The difference of terminology is the result of how Official Form 22C arrives at the debtor's current monthly income. In Form 22C, the debtor reports both her and her spouse's income, regardless of whether the case is jointly filed. Then, to figure current monthly income, the debtor is allowed to take a marital adjustment (Part III, line 19) for a non-debtor spouse's income that is not paid on a regular basis to the household expenses of the debtor or her dependents.

[6] The debtor's estranged husband listed two expenses on his Schedule J that might constitute income to the debtor. They are line 14, "Alimony, maintenance, and support paid to others", of $649.00 and line 17, "Other – education expenses for daughter", of $100.00. Including these expenses listed on the debtor's estranged husband's

there is any basis to proceed with the objection: "*To the extent* the Debtor's spouse made any contribution toward payment of such household expenses . . . such contributions must be included in the calculation of the Debtor's 'current monthly income.'" Legal Mem. in Support of State Dep't Fed. Credit Union's Obj. to Confirmation, Docket Entry 25, at 3-4 (emphasis added). The credit union has not carried its burden to show that the debtor incorrectly failed to include some portion of her spouse's income. The court will overrule the credit union's objection to plan confirmation to the extent it argues the debtor wrongly omitted her spouse's contributions to current monthly income. The court concludes that the debtor's current monthly income is $8,573.06.

Having determined current monthly income, the court has computed the first component of disposable income. To arrive at the debtor's disposable income, the court must now subtract from current monthly income the allowable expenses set forth in §1325(b)(2)(A).[7] In a departure from pre-BAPCPA practice, the Bankruptcy Code now differentiates between below- and above-median income debtors for purposes of calculating disposable income. For above-median debtors, the amounts reasonably necessary to be expended under §1325(b)(2)(A)(I) are "determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." 11 U.S.C. §1325(b)(3). The Code is silent as to how a below-median debtor's expenses are to be calculated, and the more flexible pre-BAPCPA practice of determining the reasonableness of the expenses listed on Schedule J continues to apply. 8 *Collier on Bankruptcy* ¶1325.08[5][c][ii]; *see, e.g.*, *In re Cleary*, 357 B.R.

---

Schedule J on the debtor's Form 22C still results in negative "Monthly Disposable Income under §1325(b)(2)" on line 58 of Form 22C. The negative is reduced from -$1,158.72 to -$409.72. The additional $325.00 adjustment noted in footnote 2 still leaves a negative Monthly Disposable Income. Nonetheless, it is quite clear that ***all*** of the estranged husband's income is not paid to the debtor. It remains the creditor's burden to show how much, if any, should be included. Here, the creditor chose to present no evidence on this issue.

[7] Section 1325(b)(2)(B) provides another set of allowable expenses "if the debtor is engaged in business." The debtor in this case is a consumer debtor, and §1325(b)(2)(B) does not apply.

369, 372-73 (Bankr.D.S.C. 2006); *In re Guzman*, 345 B.R. 640, 642 (Bankr.E.D.Wis. 2006) ; *In re McGuire*, 342 B.R. 608, 611 (Bankr.W.D.Mo. 2006). Applying the statute to this case reveals that this debtor is an above-median income debtor: the debtor's current monthly income multiplied by twelve ($102,876.72) exceeds the applicable median family income in Virginia for a household size of 3 ($67,788). Therefore, in calculating disposable income, the court will apply §707(b)(2)(A) and (B)—and not the expenses listed on Schedule J—to determine the amounts reasonably necessary to be expended for maintenance of the debtor and her dependents.

The parties disagree on whether the debtor can take a deduction for future payments on claims secured by property she intends to surrender. As part of the §707(b)(2) deductions, the debtor is permitted to subtract "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition . . . divided by 60" as a part of the debtor's average monthly payments on account of secured debt. 11 U.S.C. §707(b)(2)(A)(iii)(I). In Part IV, Subpart C, line 47 of Form 22C, the debtor includes a $4,674.30 deduction for payments on debt secured by property. This includes payments on the first and second mortgage on real property in Dumfries, Virginia, and payments on three car loans. Of these four properties, the debtor's plan indicates an intent to surrender the real property and two of the vehicles, leaving only a $293.52 monthly payment to the credit union for a 2005 Volkswagen Jetta she intends to retain.

As of the petition date, there is no dispute that the debtor was contractually required to make monthly payments on account of secured debt in the amount of $4,674.30, as listed on Form 22C. There is also no dispute that the debtor has or will surrender most of the property securing these debts and that, as a result, the debtor will be paying $293.52 to secured creditors during the term of

the plan. The trustee and credit union take the position that only a $293.52 deduction should be allowed under §707(b)(2)(A)(iii) because it is the only property the debtor is retaining and making payments on during the term of the plan. The debtor responds that the entire amount of the deduction is properly taken under the statute.

Bankruptcy courts are divided as to whether a chapter 13 debtor may, for purposes of calculating projected disposable income, deduct monthly payments for debt secured by property that is to be surrendered. The two lines of cases are well illustrated by *In re Van Bodegom Smith*, 383 B.R. 441 (Bankr.E.D.Wis. 2008), and *In re Burmeister*, 378 B.R. 227 (Bankr.N.D.Ill. 2007). The facts of these cases are nearly identical to the present case: the chapter 13 debtor's calculation of projected disposable income includes a deduction for payments on surrendered property, leading the trustee to assert that the debtor is not contributing all of her projected disposable income to pay unsecured creditors as required by §1325(b)(1)(B). The key disagreement between the two is the effect of the phrase "as of the effective date of the plan" in §1325(b)(1)(B).[8]

The *Van Bodegom Smith* court concluded that debtor may not deduct payments on surrendered property because the phrase modifies all of §1325(b)(1)(B), meaning the calculation of the debtor's projected disposable income is made as of the effective date of the plan, i.e., at the time of plan confirmation. 383 B.R. at 451. The court treats the debtor's confirmed plan, which indicates an intent to surrender the property for which payments are deducted, as a new contract and as the relevant contract for determining what is "scheduled as contractually due to secured creditors" under

---

[8] Section 1325(b)(1)(B) provides as follows: "If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, *as of the effective date of the plan* . . . the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period . . . will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. §1325(b)(1)(B) (emphasis added).

9

§707(b)(2)(A)(iii)(I). *Id.* at 452. The result is that the chapter 13 plan requires no payments on account of the surrendered property because the debtor intends to surrender the property. Accordingly, payments on account of surrendered debt are not "scheduled as contractually due to secured creditors" and cannot be deducted in determining projected disposable income.

The court in *Burmeister* reached a different conclusion:

> 'As of the effective date' in section 1325(b)(1) only modifies 'the plan provides' in section 1325(b)(1)(B), not 'disposable income' later in the same section, and so these sections dictate *when* the plan has to provide for payment of all the debtor's disposable income to unsecured creditors. *What* the debtor's disposable income is, on the other hand, depends on section 707(b)(2).

378 B.R. at 231. According to the *Burmeister* court's reasoning, the phrase "as of the effective date of the plan" only affects the timing for when the court is to assess whether the plan requires the debtor to turn over all projected disposable income to unsecured creditors. The calculation of the debtor's projected disposable income "is made as of the petition date, not the confirmation date." *Id.*

This court agrees with the *Burmeister* court's analysis and will adopt it. Section 1325(b)(3) requires that, for an above-median income debtor, the allowable expenses for calculating disposable income are taken from the chapter 7 means test set forth in part in §707(b)(2)(A) and (B). Section 707(b)(2)(A)(iii) makes specific allowance for "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the petition date." 11 U.S.C. §707(b)(2)(A)(iii)(I). In a chapter 7 case, where there is no chapter 13 plan and the only possible "contract" for purposes of §707(b)(2)(A)(iii) is the prepetition contract between the debtor and the secured creditor, both the *Van Bodegom Smith* and *Burmeister* courts concur that the chapter 7 debtor is allowed to deduct payments on account of surrendered property in performing the means

10

test. *See Van Bodegom Smith*, 383 B.R. at 449; *Burmeister*, 378 B.R. at 230 & n.1. There is no reason why the phrase "scheduled as contractually due" should mean one thing when applying §707(b)(2) in a chapter 13 case and another in a chapter 7 case. The *Burmeister* analysis is persuasive and maintains a consistent interpretation of §707(b)(2) regardless of whether the debtor seeks relief under chapter 7 or chapter 13.

Therefore, an above-median chapter 13 debtor's deductions for "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the petition date" should be determined as of the petition date and without regard to whether the debtor intends to surrender the collateral for any secured debt. *See Burmeister*, 378 B.R. 230-31. The result in this case is that the debtor properly deducted the payments for debts secured by property she intends to surrender. The debtor's Form 22C is properly completed and properly shows zero disposable income, which necessarily means that the debtor has no projected disposable income for purposes of section 1325(b)(1)(B). *See Solomon v. Cosby (In re Solomon)*, 67 F.3d 1128, 1132 (4th Cir. 1995) (rejecting a speculative approach to determining "projected disposable income" and instructing that the figure is calculated by taking the debtor's disposable income and extending that amount over the course of the plan); *In re Alexander*, 344 B.R. 742, 749-50 (Bankr.E.D.N.C. 2006) (applying *Solomon* and concluding that "debtors with no disposable income under the new law have no projected disposable income"). As the debtor has no projected disposable income, she has satisfied §1325(b)(1)(B)'s command to apply all of her projected disposable income to pay unsecured creditors. The court will overrule the trustee's and the credit union's objections under

§1325(b) to confirmation of the debtor's plan.[9]

### B. *Good Faith of Plan Proposed*

The Bankruptcy Code permits the court to confirm a chapter 13 plan only if, among other things, "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. §1325(a)(3). The credit union and the trustee each object to the plan because it fails to meet

---

[9] The court is sympathetic to the trustee's and the credit union's plea that the debtor is "gaming" the bankruptcy system by retaining a sizeable portion of her actual monthly disposable income while paying nothing to unsecured creditors. No system directed at curbing bankruptcy abuse is perfect. The court previously stated:

> Congress sought to address the specter of bankruptcy abuse in the Bankruptcy Abuse Prevention and Consumer Protection Act it enacted in 2005 after many years of study and consideration. One area of perceived abuse was that debtors who could make meaningful payments to their creditors were choosing chapter 7 over chapter 13. Another was that those who chose chapter 13 could pay more than they were paying in their chapter 13 plans. There were many different opinions. Academics and others who studied the issues never reached a consensus on the extent of abuse. Estimates varied widely. One approach proposed to resolve these issues was the adoption of objective national standards both to act as a gateway into bankruptcy and to establish the amount of plan payments.
>
> There are two approaches to setting plan payments: case-by-case determinations and standardized determinations. The Chandler Act of 1938 and the Bankruptcy Reform Act of 1978 both opted for individualized treatment of each chapter 13 case. In each bankruptcy case, the chapter 13 trustee examined the facts and circumstances of the debtor's financial affairs to determine on an individual basis what the debtor could afford to pay to his or her creditors. Creditors also had the opportunity to examine the debtor, the plan, and the schedules and to object to confirmation. Based on the chapter 13 trustee's recommendations, creditor objections (if any), the debtor's schedules, and any evidence taken at the confirmation hearing, the court determined if the debtor was devoting his or her actual projected net disposable income to the chapter 13 plan. The other approach is a formula applicable to all debtors. The debtor, the trustee and the court only need the input, mainly the debtor's income. The formula mechanically determines the result, the amount of the plan payment.
>
> Neither approach is perfect. One consequence of the individualized approach is the seeming lack of uniformity and the consequent suspicion – sometimes well justified – that some debtors are taking advantage of the bankruptcy system by not paying everything that they could. One consequence of the formula approach is that it prevents some debtors who want to pay their creditors from succeeding because the computed payment is too much for their particular circumstances. Another consequence is the windfall some debtors receive when the mathematical formula results in a chapter 13 plan payment that is less than the amount that they can afford to pay.
>
> Congress was undoubtedly aware of the tradeoffs between the two approaches. In 1938 and 1978, it chose the first; in 2005, the second. The statutory language is clear. The court has no discretion to substitute its judgment for that of Congress.

*In re Winokur*, 364 B.R. 204, 205-206 (Bankr.E.D.Va. 2007).

the good faith requirement by not submitting all projected disposable income to pay unsecured creditors. The credit union makes the additional argument that the plan proposed is not in good faith because the debtor deducts payments on surrendered property in calculating her projected disposable income.

This court previously held that "[i]f the sole objection to the debtor's good faith is that the debtor proposes to pay the amount Congress requires by the mathematical formula, the debtor has complied with the good faith requirement. He has done everything Congress asked him to do." *In re Winokur*, 364 B.R. 204, 206 (Bankr.E.D.Va. 2007). As discussed in Part A, the debtor has properly calculated her projected disposable income, the result of which is that no payment to unsecured creditors is required under 11 U.S.C. §1325(b)(1)(B). Her calculations of current income and permissible expenses pursuant to §707(b)(2) were both correct. The court will overrule the trustee's and the credit union's objections to plan confirmation under §1325(a)(3).

### C. *The Treatment of Claim No. 9*

Prior to the enactment of BAPCPA, the Bankruptcy Code permitted a debtor to bifurcate a claim secured by personal property by treating the claim as secured to the extent of the property's value and as an unsecured claim as to the deficiency. A chapter 13 plan could then confirmed by cramdown against the holder of a secured claim so long as the secured claim was paid in full through the plan. *See* 11 U.S.C. §§506(a), 1325(a)(5)(B). In order to prevent cramdown of claims coming within these provisions, BAPCPA enacted major changes to §1325(a), including the addition of the "hanging paragraph," which is the free-standing unnumbered paragraph at the conclusion of the subsection:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that

> paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor[.]

11 U.S.C. §1325(a). The parties agree that the requirements of the hanging paragraph are met with respect to Claim No. 9. Their dispute arises over the effect of the hanging paragraph. The debtor's position is that she may bifurcate the credit union's claim so long as it is paid in full. Thus, over the term of the plan, the allowed secured claim reduced to the value of the collateral would be paid in full with interest while the unsecured portion would be paid in full without interest notwithstanding no distribution on unsecured claims. The credit union asserts that because the hanging paragraph makes §506 bifurcation inapplicable to claims under §1325(a)(5), in order to cramdown the plan, its entire claim must be treated as secured and paid in full with interest.

The operation of the hanging paragraph remains one of the most litigated BAPCPA issues. While the intricacies of the statute remain subject to considerable debate, a general consensus has emerged that the hanging paragraph prohibits the cramdown of a plan that bifurcates a claim governed by the hanging paragraph. The debtor's argument that an undersecured claim governed by the hanging paragraph can be bifurcated has been rejected in this district. *See, e.g.*, *In re Lorenz*, 368 B.R. 476, 483 (Bankr.E.D.Va. 2007); *In re Phillips*, 362 B.R. 284, 298 (Bankr.E.D.Va. 2007). The result is that claims subject to the hanging paragraph may not be bifurcated and must "be paid as secured claims, in the full amount of the claim." *Phillips*, 362 B.R. at 298 (citing *In re Ellegood*, 362 B.R. 696, 699-700 (Bankr.E.D.Va. 2007)).

The debtor's plan proposes to bifurcate Claim No. 9 into separate secured and unsecured claims and to treat those claims differently. The hanging paragraph forecloses the availability of this option. Unless the credit union agrees otherwise or the debtor surrenders the vehicle, *see* 11 U.S.C.

§1325(a)(5)(A), (C), the debtor must treat the entirety of Claim No. 9 as a secured claim and must pay it in full over the course of the plan with interest. As such, the claim must be classified solely under Section 3(A) of this court's standard form of chapter 13 plan and paid accordingly. The credit union's objection will be sustained and the plan will be denied confirmation.

## **Conclusion**

The court will sustain the credit union's objection to confirmation to the extent it is based on the debtor's failure to properly treat Claim No. 9 filed by the credit union, and will deny confirmation of the debtor's plan dated December 4, 2007. The court will overrule the remainder of the trustee's and the credit union's objections to plan confirmation.

Alexandria, Virginia
May 29, 2008

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Gregory M. Van Doren
William R. Feldman
Gerald M. O'Donnell

14222